THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| BMF ADVANCE, LLC, a New York limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>LITISCAPE, LLC, an Arizona limited liability company; ENCORP, LLC, an alleged limited liability company; EN CORP USA, a Texas corporation; JOSEPH H, INC., a foreign corporation; MICHAEL KAMALU, an individual; JOSEPH AZULAY, an individual; and CLARK BUSINESS LAW, PLLC, a Utah professional limited liability company; and DOES 1–10,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [85] DEFENDANT CLARK BUSINESS LAW'S MOTION TO DISMISS**<br><br>Case No. 2:21-cv-00103-DBB-DBP<br><br>District Judge David Barlow<br><br>Chief Magistrate Judge Dustin B. Pead |

Before the court is Defendant Clark Business Law, PLLC's ("CBL") *Motion to Dismiss Claims III and VII of Plaintiff's First Amended Complaint*.[1] CBL asserts that Plaintiff BMF Advance, LLC ("BMF") has failed to state a claim against CBL and moves to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6). Having reviewed the parties' briefs and relevant case law, the court concludes that the motion can be resolved without oral argument.[2] For the reasons stated herein, the court grants CBL's motion to dismiss claims III (negligence) and VII (constructive trust).

---

[1] ECF No. 85, filed June 24, 2022.
[2] *See* DUCivR 7-1(g).

1

# BACKGROUND[3]

In June 2020, BMF agreed to be involved in a transaction for the purchase of six million boxes of nitrile gloves.[4] The transaction required BMF to furnish three million dollars to Fundigo, LLC.[5] Fundigo, LLC would use the funds to provide upfront costs to Litiscape, LLC.[6] Litiscape, LLC would purchase nitrile gloves from a supplier in Vietnam and then sell them to Joseph H Inc.[7] Joseph H Inc. would then resell the gloves and share the profit with Fundigo, LLC, which in turn would repay BMF.[8]

However, instead of depositing the funds with Fundigo, LLC, BMF "caused [$1.8 million] to be deposited" into the custody of CBL on July 22, 2020.[9] CBL is the law firm that represents Litiscape, LLC and its principal, Michael Kamalu.[10] CBL made no inquiry into the source of the $1.8 million, but it knew or should have known that the $1.8 million were an investor's funds for use in the glove transaction.[11]

On or about the same day, Joseph H Inc. and its principal, Mr. Azulay, requested that Fundigo, LLC authorize the release of the $1.8 million in CBL's custody to Litiscape, LLC.[12] Fundigo, LLC immediately relayed Mr. Azulay's and Joseph H Inc.'s request to BMF.[13] At first, BMF and Fundigo, LLC declined the request.[14] But then Litiscape, LLC and Mr. Kamalu verbally assured BMF and Fundigo, LLC that the released funds would go directly to XPO, a

---

[3] At the motion to dismiss stage, the court accepts Plaintiff BMF's well-pleaded allegations as true. *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1156 n.1 (10th Cir. 2021).
[4] First Am. Compl. ¶¶ 14–16, ECF No. 75, filed June 1, 2022.
[5] *Id.* at ¶ 17.
[6] *Id.* at ¶ 16.
[7] *Id.*
[8] *Id.*
[9] *Id.* at ¶ 18.
[10] *Id.* at ¶ 99.
[11] *Id.* at ¶ 28.
[12] *Id.* at ¶ 19.
[13] *Id.* at ¶ 20.
[14] *Id.* at ¶ 21.

logistics company, to cover freight charges for shipping the gloves.[15] Following these assurances, BMF authorized the release of the $1.8 million to XPO.[16]

Mr. Azulay subsequently executed a document titled "Wire Transfer Authorization."[17] The Wire Transfer Authorization instructed CBL to transfer the $1.8 million to Litiscape, LLC[18]—even though BMF had authorized the release to XPO. The Wire Transfer Authorization falsely stated that Mr. Azulay was authorized to act on behalf of BMF.[19] Mr. Azulay signed the document as "President" and "CEO" of BMF.[20]

CBL did not verify Mr. Azulay's authority to authorize the wire transfer[21] before it released the $1.8 million to Litiscape, LLC.[22] Litiscape, LLC directed only a small portion of the funds, if any, in furtherance of the glove transaction.[23] CBL learned that Litiscape, LLC transferred the funds to Mr. Kamalu and/or used them for Mr. Kamalu's personal expenses and investments.[24] However, CBL misrepresented to BMF the amount of BMF's funds that Mr. Kamalu had received, as well as the status of the transaction.[25]

In its First Amended Complaint, BMF asserts two "claims for relief" against CBL: negligence ("Claim III") and constructive trust ("Claim VII").[26] In its motion to dismiss, CBL argues that CBL owed no duty of care to BMF and that therefore BMF's negligence claim fails.[27] Further, CBL asserts that the economic loss rule bars the claim regardless.[28] CBL also contends

---

[15] *Id.* at ¶ 22.
[16] *Id.* at ¶ 23.
[17] *Id.* at ¶ 25.
[18] *Id.* at ¶ 30.
[19] *Id.* at ¶ 25.
[20] *Id.* at ¶ 26.
[21] *Id.* at ¶ 29.
[22] *Id.* at ¶ 24.
[23] *Id.* at ¶¶ 33–41.
[24] *Id.* at ¶ 101.
[25] *Id.* at ¶ 102.
[26] *Id.* at 16–18, 23–24.
[27] Def. CBL's Mot. to Dismiss 2.
[28] *Id.* at 10–11.

that because BMF did not allege that it conferred any benefit on CBL or that CBL retains possession of the $1.8 million at issue, BMF's constructive trust claim also fails.[29]

BMF responded with an opposition to CBL's motion to dismiss, arguing that CBL affirmatively undertook to perform the release of the funds to Litiscape, LLC and therefore had a duty to confirm that the authorization was proper.[30] Alternatively, BMF argues that a special relationship—that of bailor and bailee—existed between BMF and CBL and that therefore CBL owed a duty to BMF.[31] BMF contends that the economic loss rule does not apply because CBL owed BMF an independent duty.[32] Finally, BMF argues that because CBL breached its duty to BMF, a constructive trust is warranted.[33] The "unjust enrichment" element, BMF argues, is satisfied by the legal fees that CBL received by representing Litiscape, LLC and Mr. Kamalu, and it was CBL's wrongful behavior in not verifying the authorization that harmed BMF.[34] CBL replied, re-asserting its arguments.[35]

## STANDARD

Federal Rule of Civil Procedure 8(a) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."[36] When the complaint fails "to state a claim upon which relief can be granted," the defendant may move for the claim's dismissal under Federal Rule of Civil Procedure 12(b)(6).[37] "The court's function on a Rule

---

[29] *Id.* at 3.
[30] Pl.'s Mem. in Opp'n 5–10, ECF No. 93, filed Aug. 5, 2022.
[31] *Id.* at 10–16.
[32] *Id.* at 16.
[33] *Id.* at 17.
[34] *Id.* at 17–20.
[35] Def. CBL's Reply Mem., ECF No. 96, filed Sept. 13, 2022.
[36] Fed. R. Civ. P. 8(a)(2).
[37] Fed. R. Civ. P. 12(b)(6).

12(b)(6) motion is . . . to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[38]

"[F]or purposes of resolving a Rule 12(b)(6) motion, [the court] accept[s] as true all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff."[39] However, a "pleading that offers 'labels and conclusions,'" "'naked assertion[s]' devoid of 'further factual enhancement'" or 'a formulaic recitation of the elements of a cause of action will not do.'"[40]

Instead, "[a] complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'"[41] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42]

## DISCUSSION

### I. BMF Fails to State a Claim for Negligence Because the Alleged Facts Do Not Make It Plausible that CBL Owed BMF a Duty.

Under Utah law,[43] "[t]he essential elements of a negligence action are: (1) a duty of reasonable care owed by the defendant to plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of injury; and (4) the suffering of damages by the plaintiff."[44] The existence of a duty is a matter of law,[45] and "[i]f the district court determines that the defendant

---

[38] *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir.1999)).

[39] *Id.* (citing *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)).

[40] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *id.* at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

[41] *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[42] *Id.* (quoting *Iqbal*, 556 U.S. at 678).

[43] The parties agree that Utah law governs BMF's negligence cause of action and request for a constructive trust.

[44] *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985).

[45] *Torrie v. Weber Cnty.*, 2013 UT 48, ¶ 9, 309 P.3d 216, 220.

owed no duty to the plaintiff, 'there can be no negligence as a matter of law.'"[46] As the parties do not cite to any Utah case law recognizing—or refusing to recognize—a law firm's duty under the circumstances BMF alleges in its complaint, the court must determine whether a duty exists.

"Duty arises out of the relationship between the parties and imposes a legal obligation on one party for the benefit of the other party."[47] The "baseline principle" is that "a party does not [ordinarily] have an affirmative duty to care for another."[48] The Utah Supreme Court has established five factors relevant to a court's analysis of whether a duty exists:

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) "public policy as to which party can best bear the loss occasioned by the injury;" and (5) "other general policy considerations."[49]

In this analysis, "[n]ot every factor is created equal"[50] and each may weigh in favor or against imposing a duty.[51] The Utah Supreme Court has "discarded any discussion of the factors as necessarily 'plus' or 'minus' factors" and instead now "emphasize[s] that '[s]ome factors are featured heavily in certain types of cases, while other factors play a less important, or different, role.'"[52]

The court performs its analysis of duties of care at a categorical level rather than on a case-by-case basis.[53] Therefore, instead of determining whether CBL specifically owed a duty to

---

[46] *Crossgrove v. Stan Checketts Properties, LLC*, 2015 UT App 35, ¶ 3, 344 P.3d 1163 (quoting *Tallman v. City of Hurricane*, 1999 UT 55, ¶ 5, 985 P.2d 892).

[47] *Torrie*, 2013 UT 48, ¶ 9 (quoting *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906); *see B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228 ("In negligence cases, a duty is 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" (quoting *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 321 (Utah 1997))).

[48] *Herland v. Izatt*, 2015 UT 30, ¶ 12, 345 P.3d 661, 665 (quoting *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986)) (alteration in original).

[49] *Jeffs*, 2012 UT 11, ¶ 5 (citations omitted).

[50] *Id*.

[51] *Boynton v. Kennecott Utah Copper, LLC*, 2021 UT 67, ¶ 21, 500 P.3d 847.

[52] *Id*. ¶ 20 (quoting *Herland*, 2015 UT 30, ¶ 13).

[53] *Id.* at ¶ 22 ("[W]e do not decide in this case whether Kennecott, PacifiCorp, and Conoco specifically owe a duty to Barbara for take-home exposure to asbestos that allegedly caused her mesothelioma. Instead, to determine

BMF under the complaint's facts, the court considers law firms as a class, a law firm of a party to a contract transferring funds between parties without verifying the authority of the transaction's authorizer, and the full range of injuries that could result in this class of cases.

### A. CBL's Allegedly Tortious Conduct Consisted of an Omission, Weighing Against Imposing a Duty.

"The long-recognized distinction between acts and omissions—or misfeasance and nonfeasance—makes a critical difference and is perhaps the most fundamental factor courts consider when evaluating duty."[54] "Acts of misfeasance, or 'active misconduct working positive injury to others,' typically carry a duty of care," while "[n]onfeasance—'passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant'—by contrast, generally implicates a duty only in cases of special legal relationships."[55] "This distinction is key, since a duty will arise only where an alleged tortfeasor's conduct 'has gone forward to such a stage that [inaction] would commonly result' in an injury."[56] "Stated differently, an alleged tortfeasor's conduct must have created a situation where harm will commonly or foreseeably result, such that his inaction would permit the already advancing, foreseeable harm to work its course."[57]

The Supreme Court of Utah has found that a party takes "affirmative acts" when it prescribes medication, provides therapy, places inmates in a work-release program, supplies an

---

whether a duty exists, we consider premises operators, take-home exposure to asbestos, [and] all the resulting injuries . . . ."); *see Jeffs*, 2012 UT 11, ¶ 23 ("Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims" and "should be articulated in relatively clear, categorical, bright-line rules of law applicable to a general class of cases."); *id.* ("In this case, for example, the duty question does not turn on the specific combination of pharmaceuticals that Nurse West prescribed or the particular injury that it allegedly caused. Rather, the duty analysis considers healthcare providers as a class, negligent prescription of medication in general, and the full range of injuries that could result in this class of cases.").

[54] *Jeffs*, 2012 UT 11, ¶ 7 (citing Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability,* 56 U. PA. L. REV. 217, 219 (1908)).

[55] *Id.* at ¶ 7.

[56] *Herland*, 2015 UT 30, ¶ 35 (alterations in original).

[57] *Id.*

intoxicated person with a gun,[58] or causes employees to come into contact with asbestos.[59] It has "not found an affirmative act when a party *fails* to perform a background check or *fails* to train and supervise employees."[60]

In *Graves v. North Eastern Services, Inc.*,[61] the Utah Supreme Court found that an employer's omissions in not performing an employment background check and in not providing training and supervision were not affirmative acts.[62] It was not the employer's affirmative act of hiring the employee that caused the third party harm, but its failure to perform a background check and to provide training.[63] However, in *Scott v. Universal Sales, Inc.*,[64] the Court found that a county's operation of a work-release program was an affirmative act weighing in favor of imposing a duty, even though it was the program's screening procedure's inadequacies that caused the harm.[65] The difference is that in *Scott*, the county "created the situation where harm will commonly or foreseeably result" by placing "potentially dangerous" inmates "outside prison walls without any meaningful supervision by prison officials,"[66] whereas in *Graves*, the employer's conduct in hiring an individual without conducting a background check had not "gone forward to such a stage that [inaction] would commonly result' in an injury."

At the categorical level, the court concludes that "at least under some . . . scenarios, the alleged conduct"—transferring funds—"constitutes an affirmative act."[67] However, the court is inclined to examine BMF's alleged facts in order to refine the category of cases under

---

[58] *Boynton*, 2021 UT 67, ¶ 26 (citations omitted).
[59] *Id.* at ¶ 28.
[60] *Id.* at ¶ 26 (citing *Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 27, 345 P.3d 619).
[61] 2015 UT 28.
[62] *Id.* at ¶ 27.
[63] *Id.*
[64] 2015 UT 64, 356 P.3d 1172.
[65] *Id.* at ¶ 36; *see id.* at ¶ 34 ("First, *operating a work-release program* is an affirmative act, not an omission. . . . Third, *failing to adequately screen inmates* before allowing them to participate in a temporary work-release program could foreseeably result in dangerous individuals harming others." (emphasis added)).
[66] *Id.* at ¶ 36.
[67] *Herland*, 2015 UT 30, ¶ 38.

consideration, because this act-or-omission factor "makes a critical difference and is perhaps the most fundamental factor courts consider when evaluating duty."[68]

Here, the complaint avers that BMF "caused the funds to be deposited" with CBL. It does not allege that CBL requested the funds or undertook any action to enable that deposit. Instead, CBL "made no inquiry into the source of the funds." According to the complaint, CBL knew the funds were an investor's funds for use in its client's transaction. Mr. Azulay then sent CBL a wire transfer authorization in which Mr. Azulay purported to be "authorized to act on behalf of" BMF.[69] The authorization directed CBL to release the funds to CBL's client, Litiscape, LLC.[70] BMF alleges that CBL "took no steps to verify [Mr.] Azulay's authority (or lack thereof) to authorize a wire transfer."[71] CBL released the funds to Litiscape, LLC.[72]

BMF contends that "BMF's harm arose from CBL's failure to confirm the authorization was proper and the harm was finalized when CBL affirmatively released the funds from its account to CBL's own client."[73] In other words, BMF points to CBL's *omission* to verify Mr. Azulay's authority. Because this is inaction, such as not conducting a background check or failing to use adequate screening procedures, the court must inquire into whether CBL's "conduct has gone forward to such a stage that [inaction]"—not verifying the purported authorizer's authority—"would commonly result in an injury."

---

[68] *Jeffs*, 2012 UT 11, ¶ 7 (citing Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability,* 56 U. PA. L. REV. 217, 219 (1908)).
[69] First Am. Compl. ¶¶19–26.
[70] *Id.* at ¶¶ 24–31.
[71] *Id.* at ¶ 29. BMF does not specifically allege that the Wire Transfer Authorization caused CBL to release the funds to the wrong recipient. Instead, it alleges that "Joseph H Inc., [Mr.] Azulay, Litiscape, and [Mr.] Kamalu caused the [$1.8 million] to be released to Litiscape rather than XPO," and that Mr. Azulay executed the Wire Transfer Authorization to "effectuate that diversion." However, at the motion to dismiss stage, the court draws the reasonable inference in favor of BMF that the Wire Transfer Authorization caused CBL to release the funds to Litiscape, LLC.
[72] *Id.* at ¶ 24.
[73] Opp'n 7.

However, BMF does not allege that CBL took affirmative actions before releasing the funds; it contends that CBL passively received both the funds and the fraudulent authorization. On these facts, CBL's conduct had not "gone forward" at all: CBL did not create a situation where harm was foreseeable because CBL took no actions. The alleged instrument of harm was the fraudulent wire transfer authorization, and BMF does not contend that CBL created that harm by its own wrongful act—instead, BMF alleges that Mr. Azulay did. Because BMF does not aver that the harm was created by any wrongful act of CBL, CBL's failure to verify Mr. Azulay's authority was not an affirmative action.

This factor, therefore, weighs against imposing a legal duty on a law firm to verify a transfer authorization when the law firm did not act affirmatively in requesting and receiving the funds and its conduct did not create the risk of harm.

### B. CBL Did Not Have a Special Relationship with BMF, Weighing Against Imposing a Duty.

Generally, special relationships "arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection."[74] "Even in nonfeasance cases, where a bystander typically would owe no duty to prevent harm, a special legal relationship gives rise to such a duty."[75] "Traditional examples include 'common carrier to its passenger, innkeeper and guest, landowner and invitees to his land, and one who takes custody of another.'"[76]

At a categorical level, a law firm does not have a special relationship with a third party.[77] However, BMF argues that a bailor-bailee relationship existed between BMF and CBL.[78] If such

---

[74] *Jeffs*, 2012 UT 11, ¶ 8 (quoting *Webb*, 2005 UT 80, ¶ 10).
[75] *Id.* at ¶ 9.
[76] *Id.* at ¶ 8.
[77] *Hughes v. Housley*, 599 P.2d 1250, 1254 (Utah 1979).
[78] Opp'n 10–11.

a relationship existed, this court would have to redefine the category of cases that it is examining for a duty.

"A bailment is defined as 'the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it.'"[79] "[T]he general characteristics of every bailment are the bailor's delivery of the property into the bailee's lawful custody or possession for performance of some type of service, and the bailee's obligation to *later restore it to the bailor's possession*."[80]

The complaint states that BMF caused funds to be deposited into CBL's custody. It does not state that BMF ever contracted with CBL regarding the funds. Indeed, it does not allege that the two entities interacted or communicated, and it allows for the possibility that CBL did not know the source of the funds. BMF contends only that CBL knew or should have known the funds were *an investor's,* for use in CBL's clients' glove transaction. BMF does not allege that its intention was for CBL to later restore the funds to BMF's possession.

These allegations do not support BMF's contention that a bailor-bailee relationship existed between BMF and CBL, because BMF does not allege that it agreed with CBL that CBL would hold the funds in trust for a specific purpose, after which they would be returned to BMF.

---

[79] *Allred v. Brown*, 893 P.2d 1087, 1089 (Utah Ct. App. 1995) (quoting *M. Bruenger & Co. v. Dodge City Truck Stop*, 675 P.2d 864, 868 (Kan. 1984)).

[80] 46 AM. JUR. 3D *Proof of Facts* 361 (1998) (emphasis added); 8A AM. JUR. 2D *Bailments* § 1 ("Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor."); 46 AM. JUR. 3D *Proof of Facts* 361 (1998) ("The prerequisites to establishment of a bailment may be summarized as: (1) delivery of personal property belonging to a bailor into the possession of the bailee; (2) acceptance of the property by the bailee; and (3) an agreement, either express or implied, to use the property for a particular purpose and later redeliver it to the bailor."); 19 WILLISTON ON CONTRACTS § 53:6 (4th ed.) ("It is usual to add as part of the definition of bailment that the bailee must be under a duty to redeliver the goods . . . ."); 8 C.J.S. *Bailments* § 1 ("The bailment contract is on a condition that the property be restored to the bailor in accordance with her directions as soon as the purpose for which it was bailed is satisfied.").

Therefore, it has not pleaded facts sufficient that a bailee-bailor relationship is plausible. In the absence of a special legal relationship between a law firm and a third party, this factor also weighs against imposing a duty in this category of cases.

### C. CBL Could Have Reasonably Foreseen Harm to BMF, Weighing in Favor of Imposing a Duty.

"[F]oreseeability in [a] duty analysis is evaluated at a broad, categorical level."[81] "In duty analysis, foreseeability does not question 'the specifics of the alleged tortious conduct' such as 'the specific mechanism of the harm.'"[82] "It instead relates to 'the general relationship between the alleged tortfeasor and the victim' and 'the general foreseeability' of harm."[83] Therefore, "[t]he appropriate foreseeability question for duty analysis is whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others."[84]

Here, within the general relationship of a law firm to third parties who place funds into the law firm's custody, the risk of injury is foreseeable. The category includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others. For example, if a purported transfer authorization is fraudulent, the law firm would release the funds to an unintended recipient who may not be willing to return the funds. Or, the authorization might contain a mistake, causing the law firm to transfer funds to an unintended recipient. Even if the recipient were willing to return the funds, the resulting delay could detrimentally impact the contracting parties. Therefore, the foreseeability factor weighs in favor of imposing a duty on law firms to exercise care in verifying the authority of authorizers so as to refrain from causing injury to the contracting parties.

---

[81] *Jeffs*, 2012 UT 11, ¶ 25.
[82] *Id.* at ¶ 25 (quoting *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 20, 215 P.3d 152).
[83] *Id.*
[84] *Id.* at ¶ 27.

### D. BMF, Not CBL, Could Have Best Prevented the Loss, Weighing Against Imposing a Duty.

"[T]his factor considers whether the defendant is best situated to take reasonable precautions to avoid injury."[85] "Typically, this factor would cut against the imposition of a duty where a victim or some other third party is in a superior position of knowledge or control to avoid the loss in question."[86] "In such circumstances, the defendant is not in a position to bear the loss, not because his pockets are shallow, but because he lacks the capacity that others have to avoid injury by taking reasonable precautions."[87]

The party who purportedly committed the fraud—in BMF's complaint, Mr. Azulay—is in the best position to avoid the potential harms, "namely by not committing the [fraud] in the first place."[88] But between the two parties involved here—at the categorical level, the law firm and the third party—the third party is better situated to take reasonable precautions to avoid injury because it has both superior knowledge of the transaction and initial control over the funds. As the owner of the funds, the third party can choose where it deposits the funds. The third party could elect to deposit the funds with an escrow agent rather than a contracting party's law firm. If it instead chooses to deposit the funds with another party's law firm, it could insist on an agreement detailing the limits on the law firm's authority regarding the funds, the purpose and conditions under which the law firm agrees to hold the funds, and the steps the law firm would need to take before dispensing funds. Therefore, this factor weighs against imposing a duty on CBL.

---

[85] *Id.* at ¶ 30.
[86] *Id.*; *see Boynton*, 2021 UT 67, ¶ 39 ("So, going forward, we will more appropriately refer to this factor as 'who can best prevent the loss.'").
[87] *Jeffs*, 2012 UT 11, ¶ 30.
[88] *Mower v. Baird*, 2018 UT 29, ¶ 29, 422 P.3d 837 ("When sexual abuse has actually occurred, the treating therapist isn't in the best position to avoid the potential harms. The third-party abuser is in a better position to avoid the potential harms, namely by not committing the abuse in the first place.").

13

**E. Other General Policy Considerations, such as the Lack of a Similar Duty on Banks and a Law Firm's Obligation to Its Clients, Weigh Against Imposing a Duty.**

Finally, the court asks "whether general policy considerations require a categorical decision removing duty from a class of cases."[89]

CBL argues that general policy considerations counsel against imposing a duty here, observing that both banks and law firms owe duties to their clients or customers, not to third parties. BMF argues that, because there is a "privity equivalent" here, the court should find this factor favors imposing a duty.

Concerning banks, cases "consistently hold that a bank does not owe a duty to a noncustomer payee."[90] In *Ramsey v. Hancock*, the Utah Court of Appeals observed that courts have refused to find a duty when a bank deposited a check that was payable to the plaintiff into its client's account or when a bank deposited a check with its client's fraudulent endorsement of the plaintiff's signature.[91] The court of appeals highlighted that a bank "has no means of verifying the authenticity of endorsements made by those who are not their customers."[92] Just this year, the court of appeals revisited this rule, observing again that "'absent a customer or contractual relationship,' banks owe noncustomers no duty."[93]

Regarding attorneys, "the obligation of an attorney is to his client and not a third party."[94] "[A]n attorney will be held liable for negligence only to his or her client, and cannot, in the

---

[89] *Boynton*, 2021 UT 67, ¶ 44.

[90] *Ramsey v. Hancock*, 2003 UT App 319, ¶ 20, 79 P.3d 423.

[91] *Id.* at ¶¶ 10–12.

[92] *Id.* at ¶ 14 (quoting *Anschutz v. Central National Bank of Columbus*, 112 N.W.2d 545, 550 (1961)).

[93] *Legal Tender Servs. PLLC v. Bank of Am. Fork*, 2022 UT App 26, ¶ 73, 506 P.3d 1211, 1226 (quoting *Ramsey*, 2003 UT App 319, ¶ 17).

[94] *Hughes*, 599 P.2d at 1254. The Utah Supreme Court adopted this view from *National Savings Bank of District of Columbia v. Ward*, in which the United States Supreme Court held that an attorney did not owe the plaintiff a duty when "the [attorney] was never retained or employed by the plaintiffs, nor did they ever pay him any thing for [his actions], nor did he ever perform any service at their request or in their behalf." *Nat'l Sav. Bank of D.C. v. Ward*, 100 U.S. 195, 199 (1879).

absence of special circumstances, be held liable to anyone else."[95] Those special circumstances include when an "attorney's employment constitute[s] a third-party beneficiary contract," meaning the "parties clearly intended the third party to receive a benefit."[96]

The court agrees with CBL that these two policy considerations counsel against finding a duty for this category of cases. Banks are oriented to performing financial transfers as a core business function, unlike law firms, and yet courts have consistently held it inadvisable to impose a duty to non-customers on banks. This is because non-customers have recourse against the perpetrator of the fraud and it would be difficult for banks to perform the verifications necessary to protect non-customers. Law firms are oriented to protecting and advancing the interests of their clients, not third parties. Policy considerations counsel against imposing a duty to non-clients, even those transacting business with an attorney's client, because of the attorney's duty and loyalty to his own clients. Therefore, this factor also weighs against imposing a duty.

BMF points to a Maryland Court of Appeals case that BMF contends recognizes a duty whenever there is a "privity equivalent" between the parties.[97] The case, *Walpert, Smullian & Blumenthal, P.A. v. Katz*,[98] involved the former owners of a family business who made loans to the business in reliance on the business's auditing firm's reports.[99] But the auditing firm's reports contained errors, and the business went under, the former owners' chance of repayment sinking with it.[100] The former owners sued the auditing firm for accountant malpractice.[101] The Maryland Court of Appeals adopted a three-part "privity equivalent" test for imposing liability, requiring that:

---

[95] *Winters v. Schulman*, 1999 UT App 119, ¶ 25, 977 P.2d 1218.
[96] *Id.*
[97] Opp'n 15.
[98] 361 Md. 645, 648, 762 A.2d 582, 583 (2000).
[99] *Id.* at 648–49.
[100] *Id.* at 649.
[101] *Id.* at 653.

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.[102]

The former owners had met with the auditing firm on several occasions to look over the reports, and they expressly informed the firm they were using the reports for the purpose of informing their decision to lend money to the business.[103] Therefore, the former owners' claim against the auditing firm survived summary judgment.[104]

Utah courts also recognize that accountants can be held liable "where an accountant . . . is aware of the fact that his work will be relied on by a party or parties who may extend credit to his client or assume his client's obligations,"[105] and, indeed, Utah has codified the rule.[106] However, the policy applies to *accountants* and the financial reports they prepare. The *Walpert* court observed that policy considerations weighed against applying a "privity equivalent" rule to attorneys. It observed there is a strict privity rule in attorney malpractice cases because of the policy concern that "an attorney might weigh the client's interests against the attorney's fear of being liable to a third party."[107] Therefore, the reasoning in *Walpert* does not weigh in favor of imposing a duty in this category of cases.

In conclusion, four of the five factors weigh against imposing a duty on a law firm that passively receives a third party's funds as part of its client's transaction. Weighing the importance of the factors individually and collectively, they do not support the creation of the

---

[102] *Id.* at 674.

[103] *Id.* at 693–94.

[104] *Id.* at 694.

[105] *Milliner v. Elmer Fox & Co.*, 529 P.2d 806, 808 (Utah 1974).

[106] UTAH CODE ANN. § 58-26a-602.

[107] *Walpert,* 361 Md. at 663, n.8.

16

legal duty BMF requests. BMF has failed to show that CBL owed it a duty under Utah law. Accordingly, BMF's negligence claim against CBL fails.

## II.    The Economic Loss Rule Does Not Provide an Alternative Basis for Resolving this Motion Because Its Application Turns on Whether CBL Owed BMF a Duty.

The parties devote substantial space in their briefing to the economic loss rule. In CBL's view, the economic loss rule bars recovery under a negligence cause of action for purely economic damage. CBL contends that this rule precludes BMF's ability to recover from CBL *even if* CBL owed BMF a duty. BMF argues that the rule is not applicable because CBL owed BMF an independent duty, and therefore its financial loss *is* recoverable. The mismatch in arguments stems from confusion regarding the dual applications of the economic loss rule.

In Utah, "[t]he economic loss rule has two complementary yet distinct applications."[108] The first application—the one which CBL argues defeats BMF's claim—applies when there is no contract governing the parties.[109] This version of the rule "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury."[110] The Restatement (Third) of Torts reframes this concept, positing that "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another."[111] The Restatement (Third) cautions against the use of "economic loss rule" to describe this principle due to the potential for confusion[112]—confusion highlighted by the parties' briefing on this issue.

The other application of the economic loss rule—the one BMF addressed in its opposition—operates to "prevent[] recovery of economic damages under a theory of tort liability

---

[108] *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 12, 435 P.3d 193.
[109] *Id.*
[110] *Id.* (quoting *Sunridge Dev. Corp. v. RB&G Eng'g., Inc.*, 2010 UT 6, ¶ 28, 230 P.3d 1000).
[111] Restatement (Third) of Torts: Liab. for Econ. Harm § 1 (2020).
[112] *Id.* cmt. b.

when a contract covers the subject matter of the dispute."[113] This is to prevent imposing "the

plaintiff['s] 'economic expectations on parties whom the [plaintiff] did not know and with whom

[it] did not deal and upon contracts to which [it was] not a party.'"[114]

> The proper focus in an analysis under the economic loss rule is on
> the source of the duties alleged to have been breached. Thus, our
> formulation of the economic loss rule is that a party suffering only
> economic loss from the breach of an express or implied contractual
> duty may not assert a tort claim for such a breach *absent an
> independent duty of care* under tort law.[115]

"Therefore, the initial inquiry in cases where the line between contract and tort blurs is whether a

duty exists independent of any contractual obligations between the parties."[116] "When an

independent duty exists, the economic loss rule does not bar a tort claim 'because the claim is

based on a recognized independent duty of care and thus does not fall within the scope of the

rule.'"[117]

     This second application of the economic loss rule comes into play when a contract exists

between the parties or among defendants and the plaintiff attempts to seek a remedy in tort in

order to evade the contractual limitations on recovery. The economic loss rule prevents a party

from skirting the provisions of the governing agreement—including allocation of risk.

     While both applications of the rule are seemingly relevant here, the second application

does not aid in the resolution of this motion to dismiss. The second application assists a court in

deciding a controversy in which a contract governs. Typically, economic loss rule cases involve a

---

[113] *Legal Tender Servs.*, 2022 UT App 26, ¶ 46 (quoting *Reighard v. Yates*, 2012 UT 45, ¶ 14, 285 P.3d 1168); *see Reighard*, 2012 UT 45, ¶¶ 19–20 ("Thus, when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon." (citations omitted)).
[114] *SME Indus., Inc.*, 2001 UT 54, ¶ 35 (quoting *Am. Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1192 (Utah 1996)) (alterations in original).
[115] *Hermansen v. Tasulis*, 2002 UT 52, ¶ 16 (quoting *Grynberg v. Agric. Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)).
[116] *Id.* at ¶ 17.
[117] *Id.* (quoting *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000)).

plaintiff, a stranger to the contract, asserting tort claims against parties to a contract (such as a homeowners association asserting claims against the developer and builder).[118] This situation is the inverse. According to the complaint, the contracting parties include BMF, Joseph H Inc., Litiscape LLC, and Fundigo, LLC.[119] CBL is not a party to the contract. BMF seeks to recover against CBL, purportedly under a duty *independent* of the contractual obligations of CBL's clients. Because there is no allegation that CBL is a party to the contract, the second application of the economic loss rule does not resolve this case.[120] Instead, it requires the court determine whether an independent duty exists.

The first application of the economic loss rule is likewise ineffective in providing an alternative basis for resolution of this motion. BMF has asserted a negligence claim against CBL. Under Utah law, the economic loss rule "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury."[121] In Utah, this rule has been applied in product liability cases in which there is no physical injury and certain construction cases.[122] However, this rule does not bar negligence claims "expressly designed to remedy pure economic loss"—such as claims arising under a fiduciary duty or professional negligence (e.g., legal malpractice).[123] These torts stem from independent duties of care.[124] This

---

[118] *See, e.g.*, *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 23, 221 P.3d 234.
[119] *See* Compl. ¶ 16.
[120] *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020) ("*Parties indirectly linked by contract.* Sometimes a plaintiff and defendant who had no contract with each other both had contracts with the same third party. In some cases of this type, it would have been possible for the plaintiff and defendant to work out their obligations to each other in advance by carefully writing their contracts with the party who stood between them. This Section does not extend its rule[—there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties—]to those cases, however; it does not foreclose claims between plaintiffs and defendants who are only indirectly linked by contract.").
[121] *HealthBanc Int'l, LLC*, 2018 UT 61, ¶ 12 (quoting *Sunridge Dev. Corp.*, 2010 UT 6, ¶ 28) (emphasis added).
[122] *Hermansen*, 2002 UT 52, ¶ 13.
[123] *Davencourt*, 2009 UT 65, ¶ 38. "Professional negligence" requires a relationship between the parties, typically created by a contract. *See Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 41.
[124] *Davencourt*, 2009 UT 65, ¶ 38.

is the reason the two economic loss rule applications are "complementary": neither bars recovery when there is an independent duty.

As discussed above, BMF has failed to show that CBL owed it a duty. Without an independent duty, BMF cannot recover against CBL under a negligence cause of action.

### III.   BMF Cannot Seek a Constructive Trust Imposed on CBL Without Plausibly Alleging that CBL Was Unjustly Enriched.

"Courts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior."[125] "Such trusts are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another."[126] In other words, a "constructive trust is an equitable remedy."[127] It may be imposed as a form of relief once the plaintiff succeeds on a distinct cause of action[128]—i.e., establishing a wrongful act.[129] "[C]laims of unjust enrichment can support the imposition of a constructive trust," as can claims for oral express trust.[130]

BMF asserts a claim for unjust enrichment against "[t]he Azulay Parties, the Litiscape Parties, and Encorp."[131] BMF does not define any of these groupings of defendants to include CBL.[132] Therefore, a constructive trust would only be an appropriate remedy as to CBL if BMF's negligence cause of action or general allegations make it plausible that CBL was unjustly enriched.

---

[125] *Wilcox v. Anchor Wate, Co.*, 2007 UT 39, ¶ 34, 164 P.3d 353 (citing *In re Capital Mtg. Loan Corp.*, 60 B.R. 915, 918 (Bankr. D. Utah 1986)).
[126] *Id.* (*citing Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 599 (Utah 1983)).
[127] *Peirce v. Peirce*, 2000 UT 7, ¶ 12, 994 P.2d 193.
[128] *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754.
[129] "To establish a wrongful act under Utah law, an entity must have obviously received funds by mistake or participated in active or egregious misconduct." *Wilcox*, 2007 UT 39, ¶ 35.
[130] *Rawlings*, 2010 UT 52, ¶ 29.
[131] Compl. 21.
[132] *See id.* ¶¶ 4, 7, 10. And, in any event, collective pleading cannot remedy deficient allegations as to a specific party.

"A claim for unjust enrichment in Utah requires proof of three elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'"[133]

BMF alleges that CBL *released* the $1.8 million the same day BMF deposited them—in other words, that CBL did not retain the putative benefit. While BMF argues in its opposition that "BMF conferred a benefit on CBL by contributing funds to CBL . . . which ultimately led to CBL's receiving a benefit from Litiscape and [Mr.] Kamalu as their legal counsel," this is insufficient for two reasons. First, it is alleged solely in BMF's opposition and is not supported by factual averments in its complaint. Second, even if it were supported by facts in the complaint, it fails the first element of unjust enrichment: any legal fees CBL received from its clients were not conferred on it by BMF.[134]

In conclusion, BMF has not stated a claim for unjust enrichment because it does not allege that CBL retained the benefit. Because BMF does not allege that CBL was unjustly enriched, the constructive trust remedy is inapplicable as to CBL.

---

[133] *Rawlings*, 2010 UT 52, ¶ 29 (quoting *Jeffs*, 970 P.2d at 1247–48).

[134] *See Wilcox*, 2007 UT 39, ¶ 36 (refusing to find unjust enrichment when defendant-insurer received re-insurance payment under its contract with reinsurers yet did not pay the plaintiff, the insured, with the total amount of those funds).

**ORDER**

THEREFORE, IT IS HEREBY ORDERED that Defendant Clark Business Law, PLLC's motion to dismiss is GRANTED, and Plaintiff BMF Advance, LLC's third (negligence) and seventh (constructive trust) "claims for relief" are dismissed without prejudice as to Clark Business Law. As the foregoing decision resolves all claims asserted in the Amended Complaint against Clark Business Law, the court dismisses Clark Business Law as a defendant in this matter.

Signed October 25, 2022.

BY THE COURT

_____

David Barlow
United States District Judge

22